# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

**Hilda L. Solis, Secretary of Labor,**
**United States Department of Labor,**

      *Plaintiff,*

v.                                          Case No. 3:09-cv-257
                                              Judge Thomas M. Rose

**Cascom, Inc., and Julia J. Gress,**

      *Defendants.*

---

### FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING LIABILITY

---

Plaintiff, the Secretary of Labor, brought this cause of action against Defendant, Cascom, Inc., on June 3, 2009, doc. 1, amending the complaint on September 15, 2009 to add Defendant Julia J. Gress, Cascom's President. Doc. 10. The Court will refer to Defendants collectively as "Cascom." The Amended Complaint asserts that Defendants violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(1), by failing to pay overtime wages for work in excess of forty hours per week as television cable installers and 29 U.S.C. § 211(c) by failing to maintain records of hours worked. A non-jury trial in this matter was held on July 11 and 12, 2011. Based on the same, the Court makes the following findings of fact and conclusions of law.

**I.    Findings of Fact**

Defendant Cascom, Inc., had a business that contracted with Time-Warner Cable to install cable in the residences in Southwestern Ohio. Julia J. Gress was the President of Cascom. To fulfill

its contract with Time Warner, Cascom hired cable installers to do the installation. Before commencing with Cascom, the cable installers were required to complete an "employment application." R. at 10, 101. Cascom hired each installer for an indefinite period of time, not allowing the cable installers to hire their own employees without Cascom approval. The installers were paid not hourly, but for each installation performed. The installers were free to work additional hours to increase their income. The contracts entered into between Cascom and the cable installers allowed Cascom to alter the contract at any time.

The cable installation service Cascom performed did not require the skill of an electrician. Several workers had no experience even remotely related to cable installation prior to beginning with Cascom. Doc. 41 at 80. Witnesses went from jobs as simple as sales clerks to Cascom technicians with six weeks of Cascom training.

Cascom would assign work to the cable installers on a day-to-day basis. Conflicting testimony regarding the start time leaves an impression that there was a window during which workers reported to receive their initial morning assignments. R. at 20. Once in the field, workers checked in with the dispatcher after each job, remained on the job until dismissed by Cascom and completed Cascom paper work, including work orders. R. at 88. The workers followed Cascom's instructions for installation methods and work practices. Pl.'s Ex. 6. Workers sometimes attended morning meetings led by Cascom supervisors. R. at 20, 89. At one point, Sunday work was mandatory. R. at 86, ll. 18-25.

In addition, Cascom dictated all of the routes, which installers were required to accept or reject in their entirety. Workers had to wear shirts with the Cascom logo, R. at 24-25, and to display

Cascom's logo on their vehicles. R. at 24. Workers had to submit to inventory counts after business hours. R. at 23, 89. Workers had to request leave, in writing, to take a day off. R. at 24, 96, 280.

Cascom also issued direct written orders to the installers, such as: "Do not clear yourself from the field without speaking to your supervisors. The consequences won't be pretty….." Pl.'s Ex 6, 15. Another directive similarly noted that, "If we find poor workmanship and failed QC's we will have no choice but to release you. We are paying you to do your job properly so do it." Id. at 18. Cascom deducted from installers' pay "back charges" for errors. Though installers were paid for the completion of specific tasks, the back charges were made at a later date, sometimes for reasons beyond the installers' control, R. at 67, and without an opportunity to dispute them. R. at 179.

The installers did not invest in advertising their services or in other respects hold themselves out as independent businessmen. Cascom required installers to purchase their own tools costing $2,000-$5,000 or to purchase them from Cascom via payroll deductions. R. at 63, 168. The installers were also required to provide a vehicle, and those without one could choose to lease one from Cascom. R. at 92, 201, 246, 362 Cascom supplied the inventory of materials, such as modems, which the cable installers had to account for each evening without compensation. Doc. 41 at 23.

The Department of Labor contends that the work arrangement between Cascom and the cable installers amounted to an employer-employee relationship for purposes of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*

## II. Applicable Law

Defendant is accused of violating the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* The parties have stipulated that Defendants are "Employers" for purposes of the statute, doc.

30 ¶ VII, hence the only question for the Court to resolve is whether cable installers working for Cascom were "employees" as defined by 29 U.S.C. § 203 (g) & (e). The statutory definition section of the FLSA is notable for how broadly it defines "employee":

> As used in this chapter–
>
> (e)(1) Except as provided in paragraphs (2)[public office holders and their appointees], (3)[immediate family of farmers], and (4)[individuals who volunteer with the government], the term "employee" means any individual employed by an employer.
>
> * * *
>
> (g) "Employ" includes to suffer or permit to work.

29 U.S.C. § 203.

Thus, the FLSA defines "employee" in "exceedingly broad" terms, see *Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 295 (1985). The Supreme Court has noted that there are limitations to the Act's breadth, giving as an example "[a]n individual who, 'without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit,' is outside the sweep of the Act." *Id.* (citing *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947)). Thus, "[t]he test for employment under the Act is one of economic reality," *Id.* at 301, whether the persons in question undertook the covered activities "in expectation of compensation." *Id.* at 302; see also *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 369 F.3d 797, 798-99 (4th Cir. 2004) (Luttig, J., dissenting).

"Th[e] Act contains...definitions, comprehensive enough to require its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150 (1947).

Obviously, the "'to suffer or permit to work,' ... language of the FLSA,...require[s] much less positive action than under the common law." *Frees v. UA Local 32 Plumbers and Steamfitters*, 589 F. Supp. 2d 1221, 1229 (W.D. Wash. 2008) (citing 29 C.F.R. § 825.105(a)). "Mere knowledge by an employer of work done for the employer by another is sufficient to create the employment relationship under the Act." *Id.* (See also Department of Labor Field Operations Handbook § 10b01).

The Supreme Court has recognized that the principal congressional purpose in enacting the FLSA was to protect all covered workers from substandard wages and oppressive working hours, "labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers." *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 738-39 (1981) (quoting 29 U.S.C. § 202(a)). The FLSA was designed to give specific minimum protections to individual workers and to ensure that each employee covered by the Act would receive "'[a] fair day's pay for a fair day's work'" and would be protected from "the evil of 'overwork' as well as 'underpay.'" *Id.*; see also *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572, 578 (1942) (quoting 81 Cong. Rec. 4983 (1937) (message of President Roosevelt)). The Court expresses no opinion on the policies underlying the law.

Defendants' position, however, is that the cable installers are not FLSA employees, but independent contractors with whom they have contracted to have work performed. The Supreme Court has emphasized that "putting on an 'independent contractor' label does not take the worker from the protection of the Act." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947).

Indeed, no party has brought to the Court's attention a statutory basis for the "independent contractor exception," rather, it appears that "independent contractor" is the label applied to a certain category of workers who fall outside of the FLSA's ambit, and one which might better have been called something like "owner/operators of independent businesses."

Several factors have been identified to distinguish an employment relationship from a relationship with an independent business. Some of the factors to be considered are:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed;
>
> 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;
>
> 4) whether the service rendered requires a special skill;
>
> 5) the degree of permanence of the working relationship; and
>
> 6) whether the service rendered is an integral part of the alleged employer's business.

*Marshall v. Michigan Power Co.*, 1981 WL 2341, *1-2 (W.D. Mich. 1981) (citations omitted). There is no exhaustive list of factors, and whether a particular case involves an employment relationship is not to be decided on this basis of any one particular factor, but "upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. at 730. These factors are to be considered and weighed against one another in each situation, but there is no mechanical formula for using them to arrive at the correct result. Rather, the factors are simply a tool to assist in understanding individual cases, with the ultimate goal of deciding whether it is

economically realistic to view a relationship as one of employment or not. Cf. *Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185 (5th Cir. 1979) and *Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297 (5th Cir. 1975), in which the touchstone of "economic reality" is viewed as dependency, and the analysis of the various factors set forth is considered merely a step towards the determination of the ultimate issue of dependency. "The determination of an individual's status as an employee or an independent contractor has been the subject of numerous decisions. It is settled that...no one facet of the relationship is generally determinative." *Azad v. United States*, 388 F.2d 74, 76 (8th Cir. 1968); see also *Silk*, 331 U.S. at 716.

### III.     Analysis

The Court will proceed to consider these factors mindful of the "expansive conception of the meaning of the term[] ... 'employee,'" required to effectuate the FLSA. The Court will then consider Cascom's asserted good-faith defense.

### A.     Whether the Cable Installers were Employees of Cascom

Whether the cable installers were employees of Cascom is determined in light of the factors listed above.

#### 1)     Employer's right to control the manner in which the work is performed

The Department of Labor Field Operations Handbook § 10b06 explains that "Where the facts clearly establish that the possible employee is the subordinate party, the relationship is one of employment."[1] The Handbook lists several factors to consider in resolving the Amount of Control

---

[1] "Because DOL's Wage and Hour Administrator is the primary federal authority entrusted with determining the FLSA's scope, the interpretations of the DOL's Field Operations Handbook, 'while not controlling upon the courts by reason of their authority, do constitute a body of experience

> (1) whether there are restrictive provisions in the contract between the possible employer and possible employee which require that the work must be satisfactory to the possible employer and detailing, or giving the possible employer the right to detail, how the work is to be performed;
>
> (2) whether the possible employer has control over the business of the person performing work for them, even though the possible employer does not control the particular circumstances of the work;
>
> (3) whether the contract is for an indefinite period or for a relatively long period;
>
> (4) whether the possible employer may discharge employees of the alleged contractor;
>
> (5) whether the possible employer may cancel the contract at their discretion, and on how much notice;
>
> (6) whether the work done by the alleged independent contractor is the same or similar to that done by admitted employees.

§ 10b06.

In the instant case, workers were employed for an indefinite period of time, and were not allowed to have employees, or at the very least, the employees or helpers would have had to have been approved by Cascom.[2]  Cascom had the authority to alter the contract at any time.  Before

---

and informed judgment to which the courts and litigants may properly resort for guidance.'" *Reich v. Miss Paula's Day Care Center, Inc.*, 37 F.3d 1191, 1194 (6th Cir. 1994) (citing *Mabee v. White Plains Publishing Co.*, 327 U.S. 178, 182 (1946) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))).

[2] Cascom explained that Plaintiffs were not allowed to hire assistants due to the potential liability to Cascom.  While this may be true, it highlights that the job may be one that does not readily lend itself to utilization of independent contractors.

commencing with Cascom, workers were required to complete an "employment application." R. at 10, 101.

The workers were substantially controlled throughout the day. There was a window during which workers reported to receive their initial morning assignments. R. at 20. Workers checked in with the dispatcher after each job, remained on the job until dismissed by Cascom and completed Cascom paper work, including work orders. R. at 88. The workers followed Cascom's detailed instructions for installation methods and work practices. Pl.'s Ex. 6. Workers sometimes attended morning meetings led by Cascom supervisors. R. at 20, 89. Workers had to wear shirts with the Cascom logo, R. at 24-25, and display Cascom's logo on their vehicles. R. at 24. Workers had to submit to inventory counts after business hours. R. at 23, 89. Workers had to request leave, in writing, to take a day off. R. at 24, 96, 280. At one point, Sunday work was mandatory. R. at 86, ll. 18-25. In addition, Cascom dictated all of the routes, which installers were required to accept in their entirety. Cf. *Lewis v. ASAP Land Express, Inc.*, 554 F. Supp. 2d 1217, 1223 (D. Kan. 2008) (finding that a "regimented arrangement" requiring an individual to strictly follow the route dictated by the employer and to check out at the end of the day "suggested" the existence of an employee/employer relationship). Cascom also issued direct written orders to the installers, such as: "Do not clear yourself from the field without speaking to your supervisors. The consequences won't be pretty….." Pl.'s Ex 6, 15. Another directive similarly noted that, "If we find poor workmanship and failed QC's we will have no choice but to release you.." *Id.* at 18. Cascom deducted from installers' pay "back charges" for errors. Such back charges are akin to the deduction of shortages – due to loss or breakage – from hourly wage employees such as waitresses or gas station attendants.

Though installers were paid for the completion of specific tasks, the back charges were made at a later date, sometimes for reasons beyond the installers' control, R. at 67, and without an opportunity to dispute them. R. at 179. Finally, while it cannot be said that the work done by the alleged workers was identical to that performed by Cascom's admitted employees, this is because Cascom had no admitted employees engaged in its core business: cable installation.

Considering the indefinite contractual term of engagement, Cascom's quality control review processes, that Cascom controlled the cable installers ability to hire assistants, that Cascom could cancel the contracts without notice, and that Cascom had no admitted employees performing its core business, the Court finds the first factor weighs in favor finding the cable installers to be FSLA employees.

### 2) Alleged Employee's Opportunity for Profit or Loss Depending upon Own Managerial Skill

There was no opportunity for increased profit or loss depending upon an alleged employee's managerial skill. While the alleged employees were free to work additional hours to increase their income, they had no decisions to make regarding routes, or acquisition of materials, or any facet normally associated with the operation of an independent business.

### 3) Alleged Employee's Investment in Equipment or Materials Required for His Task, or His Employment of Helpers

The installers did not invest in advertising their services or in other respects hold themselves out as independent businessmen. Cascom required installers to purchase their own tools costing $2,000-$5,000 or to purchase them from Cascom via payroll deductions. R. at 63, 168. The installers were also required to provide a vehicle, and those without one could choose to lease one

from Cascom. R. at 92, 201, 246, 362. Requiring workers to provide some of their own tools is not inconsistent with an employment relationship, however, neither is this the level of investment in tools solely within the realm of an independent business. Cascom supplied the inventory of materials, such as modems, which the cable installers had to account for each evening without compensation. Doc. 41 at 23. The Court finds that the installers' investment was on the low end of what would be needed to start an independent business, but short of what an electrician might need to invest, an electrician being a businessman who might normally sell his services to perform this job as one aspect of an independent business. The Court would be more inclined to find this factor favoring a finding of the installers being independent businesses if each invested in an inventory of installation materials. The Court finds this factor neutral.

    **4)      Requirement of a Special Skill to Render the Service**

Cascom's cable installation did not require a special skill. Several workers had no experience even remotely related to cable installation prior to beginning with Cascom. Doc. 41 at 80. "[T]he skills involved were simple enough to be learned by a few weeks of on-the-job training." *Olson v. Star Lift Inc.*, 709 F. Supp. 2d 1351, 1356 (S.D. Fla. 2010). Witnesses went from jobs as simple as sales clerks to Cascom technicians with six weeks of Cascom training. This factor weighs in favor of finding the cable installers were employees.

    **5)      Degree of Permanence of the Working Relationship**

The installers were hired for an indefinite period. While some installers were only with Cascom a few weeks, most of the installers were employed by Cascom for the entire period of his

1.5 year investigation. Each worked until they quit or were terminated by Cascom, similar to an at-will employment arrangement. This factor weighs in favor of finding the installers were employees.

### 6)     How Integral the Services Are to the Employer's Business

More than integral, more than core, cable installation was the entirety of Cascom's business. This factor weighs in favor of finding the cable installers were employees.

### B.     Conclusion

In a nutshell, considering the above-stated factors, the Court concludes that these specific cable installers undertook their work "in expectation of compensation."

Clearly, given the fact-driven factors relevant to the Court's analysis, whether workers in any case will be employees or independent contractors will depend upon the facts of the individual case. See *Azad v. United States*, 388 F.2d 74, 76 (8th Cir. 1968) (when "determin[ing] of an individual's status as an employee or an independent contractor...[i]t is settled that each case must stand on its own facts."). Indeed, two federal courts have held installers to be independent contractors, but those two cases are distinguishable from the instant one. See *Chao v. Mid-Atlantic Installation Serv.*, 16 Fed. App'x 104 (4th Cir. 2001) and *Dole v. Amerilink Corp.*, 729 F. Supp. 73 (E.D. Mo. 1990). In *Mid-Atlantic* and *Amerilink*, the installers were allowed to choose and manage their own employees, who helped complete the jobs. And in *Amerilink*, the installers wore generic "cable television" logos on their shirts, as opposed to uniforms with the putative employer's logo. Also, the installers possessed the special skills of carpenter-electricians. Finally, in *Amerilink*, there was little permanence in the relationship between the installers and the firm.

In contrast, Cascom forbade its installers from employing their own helpers, asserted control by requiring installers to wear Cascom's logo, and provided training for unskilled installers. Finally, the installers often remained employed with Cascom for substantial periods of time. Simply stated, in this case the factors of control, required skills, and permanence of relationship weigh more heavily toward employee status than in *Amerilink* and *Mid-Atlantic*.

**C.     Good Faith Defense**

Cascom's Proposed Findings of Fact and Conclusions of Law assert that the Court should find that Cascom acted in good faith. Doc. 33 ¶ 4. However, "[t]o establish the requisite subjective 'good faith,' an employer must show that it took 'active steps to ascertain the dictates of the FLSA and then act[ed] to comply with them.'" *Id.* (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)). Here, Cascom points to its compliance with industry standards as a defense. As for industry standards, "the law...is that 'simple conformity with industry-wide practice' fails to demonstrate good faith under the FLSA." *Reich v. S. New England Telecom. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997); see also *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 910 (3d Cir. 1991) ("[G]ood faith cannot be established merely by conforming with industry standards." ); *Brock v. Wilamowsky*, 833 F.2d 11, 19-20 (2d Cir. 1987); *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 465 (D.C. Cir. 1976); *Rogers v. Savings First Mortgage*, LLC, 362 F. Supp.2d 624, 638 (D. Md. 2005); *Chao v. First Nat. Lending Corp.,* 516 F. Supp.2d 895, 903 (N.D. Ohio 2006).

Thus, the Court finds Cascom's installers were "employees" subject to the overtime requirements of section 7 and the record keeping requirements of section 11 of the FLSA.

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, September 21, 2011.

                                                                       s/Thomas M. Rose
                                                  _____
                                                      THOMAS M. ROSE
                                         UNITED STATES DISTRICT JUDGE